RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

  *v.*

MICHAEL D. JOHNSON,

  *Defendant-Appellant.*

> No. 05-4277

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00053—Sandra S. Beckwith, Chief District Judge.

Submitted: April 17, 2007

Decided and Filed: May 25, 2007

Before: MERRITT and GRIFFIN, Circuit Judges; LAWSON, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Thomas P. Kurt, Toledo, Ohio, for Appellant. Timothy D. Oakley, UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

_____

## OPINION

_____

DAVID M. LAWSON, District Judge. Defendant Michael D. Johnson appeals his convictions and sentences for distributing cocaine and possession of ammunition by a convicted felon on the following grounds: the fruits of a warrantless search should have been suppressed because the officers violated the knock-and-announce rule; the district court erred in admitting opinion testimony by a police officer that the defendant was engaged in drug trafficking; and the district court failed to provide any explanation for the defendant's sentence. We conclude that the search of Johnson's home and seizure of evidence were not illegal; the admission of the police officer's expert opinion testimony does not amount to plain error; and the district court failed to provide an explanation on the record for its sentence. Therefore, we will affirm the defendant's convictions, vacate the sentences, and remand for resentencing.

_____

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

On July 22, 2003, officers from the Cincinnati Police Violent Crime Squad (VCS) were investigating narcotics complaints at a house located at 4704 Peabody Avenue in Cincinnati, Ohio. Police Officer Richard Dews was in a building across the street, watching the house from a window. The house is owned by the defendant's great-grandmother.

Officer Dews observed a number of people in front of the house. Defendant Johnson, Lawrence Sims, Michael Howard, Phillip Thornton, and three women were on the front porch. Officer Dews was familiar with Mr. Sims from previous arrests, but it does not appear that he knew the others. The porch contained a couch, a couple of chairs, and a filing cabinet with a black bag on top of it.

Dews testified that he saw Sims approach a number of cars that stopped in front of the house. He saw Sims take money from people in the cars and give them something in return, which Officer Dews believed were drugs. The defendant stayed on the porch, but Dews saw Sims look back toward the porch and communicate with the defendant. To Officer Dews, it appeared that the defendant was giving Sims directions. Dews explained:

> Q. What was Mr. Johnson doing?
> A. Mr. Johnson was on the – on the porch when I first got to the location. And he would yell to Mr. Sims, who was standing in front of the building across the street where I was positioned, and he was telling him, you know, to stop the car, get this one here. So, when Mr. Sims – that's what attracted my attention to Mr. Johnson, because Mr. Sims looked back to this address where Mr. Johnson was standing on the porch, like he was getting directions or getting information from him, so they were actually communicating with one another–
> MR. COHEN: Objection, Your Honor.
> THE COURT: Overruled.

J.A. 211. Dews saw the defendant give the money that he collected from the passengers to Michael Howard, who put it in his pocket.

Officer Dews also saw Thornton approach vehicles that stopped in front of the house. Dews testified that Thornton also appeared to be getting instructions from the defendant, who stayed on the porch. Thornton would approach the cars, speak with the occupants, and return to the porch. Mr. Johnson would take something out of the black bag on the filing cabinet and give it to Thornton. Thornton would then return to the street and give the item to the occupant of the vehicle, who would give Thornton cash. Thornton returned to the porch and gave the money to one of the females sitting on the porch. This is how Officer Dews characterized what he saw:

> Q. Now, at this time were there other people located at 4704 Peabody?
> A. Yes, there were. There were three females sitting in chairs on the porch, and it [sic] was also another male on the porch by the name of Mr. Phillip Thornton. He was sitting on the porch also. Mr. Johnson was also having Mr. Thornton leave the porch and approach vehicles that were coming down Peabody, have them – have him approach the car, see what the – you know, if the car pulled up and stopped, see what they wanted. If they wanted to purchase something, what did they want to purchase. Mr. Thornton would yell back to Mr. Johnson that they wanted certain –
> MR. COHEN [defense counsel]: Objection, Your Honor; hearsay.
> THE COURT: Sustained.
> . . .
> Q. While all this was going on, how did the defendant behave?

A.  He behaved as though he was in charge.  That he was – he was basically in charge of the whole operation, or however – whatever was being sold, whatever was being purchased, whatever activities were going on, he was the man that was in control of that at that corner.

J.A. 212-13, 215-16.

Officer Dews then was permitted to testify as an expert that the activity that he observed constituted drug trafficking:

MR. OAKLEY [AUSA]:  And, Your Honor, we would ask that the witness be identified as an expert in the identification and behavior of street-level narcotics trafficking.
THE COURT:  Mr. Cohen?
MR. COHEN:  No objection, Your Honor.
THE COURT:  All right.  Officer Dews will be accepted as an expert in the area of street-level narcotics transactions and behaviors that accompany that activity.
. . .
Q.  Officer Dews, now, based upon your experience, your training and your expertise and what you'd observed that day on July 22nd, 2003, on Peabody and Orlando, do you have an opinion, to a reasonable degree of certainty as to what was going on between Mr. Johnson and the other people?
A.  From – based on my experience and what I saw, there was actually – there was actual drug trafficking going on.  Mr. Johnson was the man in charge of the – the sale and also the operations that was there on that corner at that immediate complaint that we addressed.

J.A. 206, 224.  The defendant's attorney did not object to this testimony.

Officer Dews testified next that a Geo Tracker came by and parked in front of the house. Dews said that the defendant referred to the driver as "White Horse."  The passenger was a heavy set man.  White Horse and the heavy set man got out of the Tracker, and the defendant walked from the porch to the sidewalk to meet them.  White Horse stayed on the sidewalk, while the defendant and the heavy set man went onto the porch and sat on the couch.  Officer Dews saw the defendant put something on the ground between his feet.  Then the defendant took "a wad of money" from his left pocket and gave it to the heavy set man.  J.A. 218.  The heavy set man and White Horse left in the Tracker.

The defendant took whatever was between his feet and walked out to the street where a gray van was parked.  He called for Sims to come over.  Officer Dews could see that the defendant had a white baggie and a scale in his hands, which he handed to Sims.  Sims put the items in the van, and the defendant headed back to the porch.

Officer Dews was relaying everything he saw to other officers via radio and cellular phone. He asked these other officers to stop the Tracker, but they failed to do so.  After the transfer of items to the van and while the defendant was moving toward the porch, the other officers moved in on the house at 4704 Peabody Ave.  At that point, the defendant ran up the steps and into the house.

Police Officers Terry Dukes and Ryan Hudson were two of the officers who arrived at the house. They were in an unmarked van, but they were wearing tactical vests with "POLICE" patches on them.  Officer Dukes testified that the defendant ran into the house when Dukes shouted "Police." Officers Dukes and Hudson followed the defendant into the house and eventually found him in the closet of a bedroom on the second floor.  Officer Dukes said he drew his gun and called out "police."

He testified that the defendant threw an object out of the closet. It landed on a laundry bag on the bed, and it turned out to be a handgun. Officer Hudson recovered the handgun. He read the defendant his *Miranda* rights and then asked him if the gun was loaded. The defendant replied that it was not. The defendant was arrested.

On April 7, 2004, the defendant was charged with distributing crack cocaine in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2, possessing a firearm during the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and possessing ammunition while under disability as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).

On January 12, 2005, the defendant filed a motion to suppress evidence, arguing that the officers lacked probable cause to believe the defendant had committed a crime or that there was evidence of a crime in the house. He also argued that the warrantless entry of the house could not be justified by one of the exceptions to the warrant requirement. The district court denied the motion, concluding that Officer Dews' observations constituted probable cause to believe the defendant was engaged in drug trafficking activity. The officers were therefore entitled to arrest the defendant without a warrant. Once the police set the lawful arrest in motion, they were entitled to follow the fleeing defendant into the house under the "hot pursuit" exception explained in *United States v. Santana*, 427 U.S. 38 (1976).

On March 11, 2005, a jury convicted the defendant of distributing crack cocaine (count 2) and being a felon in possession of ammunition (count 1) but acquitted him of possessing a firearm in furtherance of a drug crime (count 3). The presentence investigative report put the defendant at an offense level of 34 with 16 criminal history points, based on the conclusion that the defendant is a career offender. The defendant filed objections to the presentence report, and the district court held a hearing, which was continued. Ultimately, the defendant conceded that the appropriate criminal history and offense levels placed the defendant in a guidelines range of 262 to 327 months. The district court sentenced the defendant on October 3, 2005 to 262 months imprisonment on count one and 120 months imprisonment on count two, to be served concurrently, and to be followed by five years of supervised release. The transcript does not reveal any explanation for the district court's sentence.

II.

The defendant first argues that the Fourth Amendment requires police officers to knock and announce their presence before forcibly entering a private residence unless exigent circumstances are present. He contends that "hot pursuit" is not an exigent circumstance justifying ignoring the knock and announce rule. Therefore, he argues, the evidence seized from inside the house should be suppressed.

The court of appeals reviews the district court's denial of a motion to suppress applying two standards: its factual findings are reviewed for clear error, and its conclusions of law are reviewed *de novo*. *United States v. Moncivais*, 401 F.3d 751, 754 (6th Cir. 2005).

Because the defendant's Fourth Amendment claim is premised on a violation of the knock-and-announce rule, the government suggests that it is vulnerable to the change in the application of the exclusionary rule wrought by the Supreme Court in *Hudson v. Michigan*, __ U.S. __, 126 S. Ct. 2159 (2006). In that case, the Court held that suppression of evidence is not the appropriate remedy for violations of the knock-and-announce rule in cases where the officers have a valid warrant. There was no warrant in this case, but we need not determine whether that difference is material because the record contains ample evidence to justify the police officers' entry without delaying to knock and announce their presence and intentions. As the Supreme Court has explained, there are

many situations in which it is not necessary to knock and announce.  It is not necessary when circumstances present a threat of physical violence, or if there is reason to believe that evidence would likely be destroyed if advance notice were given, or if knocking and announcing would be futile.  We require only that police have a reasonable suspicion under the particular circumstances that one of these grounds for failing to knock and announce exists, and we have acknowledged that this showing is not high.

*Hudson*, 126 S.Ct. at 2162-63 (internal quotes, citations, and alterations omitted).

The defendant relies on this court's decision in *Ingram v. City of Columbus*, 185 F.3d 579, 591 (6th Cir. 1999), in which it was acknowledged that "officers who are in 'hot pursuit' may demonstrate exigent circumstances that excuse the knock and announce requirement," although such justification was not shown "under the unique circumstances" of that case.  *Id.* at 591.  We believe a more applicable precedent is *United States v. Santana*, 427 U.S. 38 (1976), cited by the district court.  In that case, an undercover officer gave marked bills to Patricia McCafferty, who entered the defendant's home, gave the money to the defendant, and came back out with drugs.  The police arrested Ms. McCafferty and returned to the house to arrest the defendant.  She was standing on the porch when they arrived.  The police called out, "Police," and the defendant ran back into the house.  The police followed her in and arrested her, during which she dropped several envelopes containing heroin.  The defendant had the marked money in her pockets.  The Court held that the warrantless entry into the defendant's house was justified because the officers were in hot pursuit.  They did not knock and announce their presence.

The only remaining question is whether her act of retreating into her house could thwart an otherwise proper arrest.  We hold that it could not.  In *Warden v. Hayden*, 387 U.S. 294 (1967), we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons.  This case, involving a true "hot pursuit," is clearly governed by *Warden*; the need to act quickly here is even greater than in that case while the intrusion is much less.  The District Court was correct in concluding that "hot pursuit" means some sort of a chase, but it need not be an extended hue and cry "in and about (the) public streets."  The fact that the pursuit here ended almost as soon as it began did not render it any the less a "hot pursuit" sufficient to justify the warrantless entry into Santana's house.  Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence.  *See Vale v. Louisiana*, 399 U.S. 30, 35 (1970).  Once she had been arrested the search, incident to that arrest, which produced the drugs and money was clearly justified.

*Id.* at 42-43.

The facts of this case are almost identical to the facts in *Santana*.  The officers here had "a reasonable suspicion" that "evidence would likely be destroyed" if they followed the knock-and-announce rule.  *Hudson*, 126 S. Ct. at 2162-63.  Officer Dews had just observed the defendant engage in a number of transactions that he reasonably believed involved the sale of drugs.  It was therefore reasonable for the officers to believe that the defendant intended to destroy evidence once inside the home.  In addition, knocking would have been futile.  When the defendant saw the officers arrive and heard one of them yell "Police," he turned and fled into the house.  There was no reason to believe the defendant would answer a knock.  Because knocking would have been futile, the officers were not required to do so.

We agree with the district court that there was no Fourth Amendment violation in this case. Consequently, there is no reason to decide whether the exclusionary rule is an appropriate remedy for disregarding the knock-and-announce rule during a warrantless entry and search.

III.

Next, the defendant argues that the district court erred in permitting Officer Richard Dews to give his expert opinion that the conduct he observed amounted to drug trafficking and the defendant was "in charge." The defendant did not object at trial to Officer Dews being considered an expert witness, nor did he object to Officer Dews' testimony that the defendant was engaged in drug trafficking. This court reviews issues involving the admissibility of expert testimony for plain error where no objection was made at trial. *United States v. Abboud*, 438 F.3d 554 (6th Cir. 2006). Under this standard, the defendant must demonstrate

> (1) "error," (2) that was "plain," and (3) that "affect[s] substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affected the fairness, integrity or public reputation of the judicial proceedings."

*United States v. Oliver*, 397 F.3d 369, 378 (6th Cir. 2005).

We pause here to comment on the procedure used by the trial judge in declaring before the jury that Officer Dews was to be considered an expert. Other courts have articulated good reasons disapproving of such practices, with which we agree. *See, e.g., United States v. Bartley*, 855 F.2d 547, 552 (8th Cir. 1988) (noting that "[s]uch an offer and finding by the Court might influence the jury in its evaluation of the expert and the better procedure is to avoid an acknowledgment of the witnesses' expertise by the Court"); *State v. McKinney*, 917 P.2d 1214, 1233 (Ariz. 1996) (observing that "[b]y submitting the witness as an expert in the presence of the jury, counsel may make it appear that he or she is seeking the judge's endorsement that the witness is to be considered an expert. . . . In our view, the trial judge should discourage procedures that may make it appear that the court endorses the expert status of the witness. The strategic value of the process is quite apparent but entirely improper"). When a court certifies that a witness is an expert, it lends a note of approval to the witness that inordinately enhances the witness's stature and detracts from the court's neutrality and detachment. "Except in ruling on an objection, the court should not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion, and counsel should not ask the court to do so." *ABA Civil Trial Practice Standard 17* (Feb. 1998); *see also* Jones, Rosen, Wegner & Jones, Rutter Group Practice Guide: Federal Civil Trials & Evidence §8:1548.1 (The Rutter Group 2006). Instead, the proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objection, allowing the objector to pose *voir dire* questions to the witness's qualifications if necessary and requested. *See Berry v. McDermid Transp., Inc.*, 2005 WL 2147946, at *4 (S.D. Ind. Aug. 1, 2005) (stating that "counsel for both parties should know before trial that the court does not 'certify' or declare witnesses to be 'experts' when 'tendered' as such at trial. Instead, if there is an objection to an offered opinion, the court will consider the objection. The court's jury instructions will refer to 'opinion witnesses' rather than 'expert witnesses'"); *see also Jordan v. Bishop*, 2003 WL 1562747, at *2 (S.D. Ind. Feb. 14, 2003). The court should then rule on the objection, "to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means." Fed. R. Evid. 103(c).

Despite the procedure used in this case – to which no objection was made – we do not find that plain error occurred. Under Federal Rule of Evidence 702, a person with "specialized knowledge" qualified by his or her "knowledge, skill, experience, training, or education" may give opinion testimony if it "will assist the trier of fact to understand the evidence or to determine a fact

in issue." Fed. R. Evid. 702. Courts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable. *See United States v. Lopez-Medina*, 461 F.3d 724, 742-43 (6th Cir. 2006). There are innumerable trades and practices that employ their unique devices, feints, and codes that may mean nothing to the untrained observer but may speak volumes to a maven qualified by experience or training. The illegal drug trade certainly fits into that category. "Our court regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the understanding of the average layman." *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (quoting *United States v. Thomas*, 99 Fed. Appx. 665, 668-69 (6th Cir. 2004)).

Contact between two people on the street that might appear to the average person to be nothing more that a casual encounter could in fact be detected as a drug transaction by an experienced police officer. Interpreting those artifices, encryptions, codes, and jargon can be helpful to the jury, just as a trained observer on the baseball diamond might be able to point out the bunt sign among an array of otherwise meaningless scratches and touches by the third base coach. In this case, Officer Dews had worked for the Cincinnati police department for fourteen years, four of those years with the violent crime squad, and he had worked on narcotics investigations nearly his entire fourteen-year career. He testified that he routinely made undercover drug purchases, set up surveillance, observed individuals trafficking in narcotics interacting in the field, and reported to his surveillance team members. The government therefore established that Dews was qualified by his experience to interpret the street conduct he observed for the fact finders. *See United States v. Bender*, 265 F.3d 464, 471-72 (6th Cir. 2001) (holding that a police officer with 14 years experience was qualified "as an expert on the drug-trafficking business and the manufacture and use of powder cocaine and cocaine base"). This testimony no doubt assisted the jury to understand the evidence.

The defendant challenges this evidence on appeal on the ground that the opinion intruded on the jury's prerogative of determining guilt or innocence. He acknowledges that Rule 704 allows opinion evidence even though "it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). However, he insists that this testimony goes too far by telling the jurors how they should decide the case when they are perfectly capable of interpreting the evidence on their own.

The defendant is correct in that the advisory committee notes to Rule 704 state that the "abolition of the ultimate issue rule does not lower the bars so as to admit all opinions." Fed. R. Evid. 704, Advisory Committee Note. "[C]ertain opinions which embrace an ultimate issue will be objectionable on other grounds." *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). The advisory committee pointed to the requirements of Rules 701 and 702 that opinions must be helpful and observed that Rule 403 provides the trial judge with authority to exclude evidence that is confusing, wastes time, or is unfairly prejudicial, all of which guards "against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." Fed. R. Evid. 704, Advisory Committee Note. But the defendant failed to invoke any of these rules at trial, and we find that Officer Dews's opinion that what he saw amounted to a drug transaction was sufficiently helpful and insufficiently intrusive so as not to plainly cross the line into impermissible opinion evidence. Officer Dews did not express his opinion on the defendant's guilt, or the credibility of other witnesses, or on what the law required. Rather, he told the jury what he saw and what it meant to him as viewed through the lens of his expertise. There was no plain error.

IV.

Finally, the defendant complains that the district court did not give reasons for the sentence it imposed. Since *United States v. Booker*, 543 U.S. 220 (2005), made the United States Sentencing Guidelines advisory, the courts of appeal review sentences imposed by the district courts for

reasonableness. *United States v. Funk*, 477 F.3d 421, 425 (6th Cir. 2007). The district court's sentence must be both procedurally and substantively reasonable. *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006). "Procedural reasonableness requires a sentencing judge to 'consider' the factors outlined in 18 U.S.C. § 3553(a) . . . to enable appellate review." *United States v. Smith*, 474 F.3d 888, 894 (6th Cir. 2007). The district court is therefore required "to explain the factors that justify the sentence imposed." *Ibid.* "[T]here is no requirement that the district court engage in a ritualistic incantation of the § 3553(a) factors it considers." *United States v. Chandler*, 419 F.3d 484, 488 (6th Cir. 2005). However, the "court's opinion should be sufficiently detailed to reflect the considerations listed in § 3553(a)." *United States v. McBride*, 434 F.3d 470, 474 (6th Cir. 2006).

This court's precedent cautions that the lack of discussion of the relevant factors on the way to fashioning a sentence that is "sufficient, but not greater than necessary" to achieve the goals stated in section 3553(a) may lead to a finding of procedural unreasonableness:

> [W]e read *Booker* as instructing appellate courts in determining reasonableness to consider not only the length of the sentence but also the factors evaluated and the procedures employed by the district court in reaching its sentencing determination. Thus, we may conclude that a sentence is unreasonable when the district judge fails to "consider" the applicable Guidelines range or neglects to "consider" the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration.

*United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005).

We have examined carefully the transcript of the sentencing proceedings and the other documents submitted and are unable to find any discussion of the reasons for which the district court chose the sentence it settled upon. The district court determined that the appropriate advisory sentencing guideline range was 262 to 327 months, announced a "tentative sentence" at the bottom of the range, gave the parties an opportunity to object and comment, and when no objections were forthcoming, advised the defendant of his appellate rights. We have little doubt that the experienced and learned trial judge was aware that the sentencing guidelines were advisory and that the factors enumerated in section 3553(a) were to guide her discretion; but we are unable to point to anything in the record to confirm our surmise. Therefore, we must vacate the sentence and remand for resentencing.

V.

We find no error in the lower court's determination of the defendant's motion to suppress evidence or the admission of the opinion testimony at trial. We are unable to conclude from the record that the sentence is procedurally reasonable. Accordingly, the defendant's convictions are **affirmed**, the sentences are **vacated**, and the case is **remanded** to the district court for resentencing.