[Cite as *State v. Coleman*, 2021-Ohio-968.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee/Cross-Appellant | : | Appellate Case No. 28676 |
| | : | |
| | : | Trial Court Case No. 2018-CR-4339 |
| v. | : | |
| | : | (Criminal Appeal from |
| STEVEN COLEMAN | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant/Cross-Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of March, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee/Cross-Appellant

J. DAVID TURNER, Atty. Reg. No. 0017456, 101 Southmoor Circle NW, Dayton, Ohio 45429
      Attorney for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . .

HALL, J.

{¶ 1} Steven Coleman appeals from his conviction on charges of purposeful murder, evidence tampering, two counts of having a weapon while under disability, and a firearm specification.[1]

{¶ 2} Coleman advances two assignments of error. First, he contends the trial court erred in denying his request for a jury instruction on voluntary manslaughter. Second, he claims the trial court erred in sentencing him on a firearm specification where the record does not contain a jury verdict form addressing the specification.

{¶ 3} In a cross-appeal, the State claims the trial court erred in merging the offense of discharging a firearm on or near a prohibited premises into Coleman's murder conviction as an allied offense of similar import. Assuming that merger was not appropriate, the State also argues that an additional three-year sentence must be imposed on a firearm specification accompanying the discharging-a-firearm offense.

{¶ 4} The charges against Coleman stemmed from the shooting death of Robert Burdette outside a Dayton-area bar on the night of November 7, 2018. The State's evidence at trial established that Coleman was providing security that night as a "bouncer" for the Ashwood Lounge. Two brothers, Jason and Michael Fox, also provided security along with an unarmed bouncer named Graylon Russell. Burdette arrived at the bar that evening in an SUV driven by Tyrone McGee. After McGee parked the SUV in an unauthorized area, Russell asked him to move it. An unidentified third-party then moved the SUV into a parking space without incident.

---

[1] A jury also found Coleman guilty of discharging a firearm on or near a prohibited premises (with a firearm specification) and several other offenses and specifications, which the trial court merged into those set forth above as allied offenses of similar import.

{¶ 5} When he arrived at the bar, McGee had a handgun in his vehicle. There was some question at trial about whether he brandished it or whether it was removed from the SUV by the person who moved the vehicle. In any event, while acting in his capacity as security for the bar, Russell obtained McGee's handgun and secured it in his own truck. At some point, McGee became upset about Russell's taking the weapon and demanded its return. The two men argued about the handgun while standing in the front parking lot. Burdette also was present, and he broke a beer bottle on Russell's truck. Russell then began arguing with Burdette because he believed the bottle had been broken intentionally. Russell and Burdette eventually calmed down. At that point, Russell and McGee continued arguing about the return of McGee's handgun. As they did so, Coleman approached Burdette, who was standing in the middle of the street, and punched him in the face. After Burdette staggered, Coleman shot him in the face. The shot killed Burdette. Coleman walked away and hid the gun in lattice behind the bar. Coleman then told Jason Fox to get rid of the weapon. Fox hid the handgun in the women's restroom. He subsequently disclosed where the weapon was hidden, however, and police retrieved it.

{¶ 6} That same night, Coleman was arrested at his apartment, which was above the bar. When questioned by police, he initially denied involvement and claimed that Burdette had been shot by McGee. But after being confronted with security-video footage capturing the incident, Coleman admitted shooting Burdette. He explained that he had done so because Burdette had threatened to pull up to his house and shoot him. Coleman explained: "I get tired of people making them type of threats to me talking about what you gonna do to me. It's not gonna work because I'm gonna get you first." (Trial Tr. at 658.) Although the record contains conflicting testimony, there was some evidence that

Burdette said something like "I got guns" and "I'll call my people" prior to being shot by Coleman. The record also contains testimony that Burdette made these statements after being punched by Coleman. In addition to Coleman's confession, the State presented DNA evidence and testimony from eyewitnesses who identified Coleman as the shooter.

{¶ 7} Coleman did not testify at trial, and he called no witnesses. However, he did request a jury instruction on the inferior-degree offense of voluntary manslaughter as an alternative to murder. The trial court denied the request, finding it unsupported by the evidence. The jury subsequently found Coleman guilty of purposeful murder, two counts of felony murder, two counts of felonious assault, discharging a firearm on or near a prohibited premises, evidence tampering, and two counts of having a weapon while under disability. Most of the counts included firearm specifications, which the jury found applicable.

{¶ 8} At sentencing, the trial court merged all of the murder counts, the felonious assault counts, and the discharging-a-firearm count. The trial court found that these counts were allied offenses of similar import, and the State elected to proceed to sentencing for purposeful murder. The trial court imposed a sentence of 15 years to life in prison for the murder conviction along with a three-year prison term for the accompanying firearm specification. The trial court imposed concurrent prison terms of nine months for evidence tampering and nine months for one count of having a weapon while under disability. The trial court imposed a prison term of 24 months for the other count of having a weapon while under disability, and it ordered that sentence to be served consecutively. The result was an aggregate prison sentence of 20 years to life. This appeal and cross-appeal followed.

{¶ 9} In his first assignment of error, Coleman challenges the trial court's denial of his request for a voluntary-manslaughter jury instruction. He contends the trial court erred in finding that no threats were made against him. Coleman cites testimony that prior to the shooting Burdette made comments about having guns and threatened to call "his people." When considered in context and viewed objectively, Coleman asserts that these comments were sufficient to provoke a reasonable person to respond with deadly force. Coleman further claims the trial court erred in finding that he subjectively was not under the influence of a sudden passion or a fit of rage when he shot Burdette.

{¶ 10} "In a proper case, a jury may consider, in addition to the offense actually indicted, inferior degrees of the indicted offense." *State v. Beatty-Jones*, 2d Dist. Montgomery No. 24245, 2011-Ohio-3719, ¶ 20, citing *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph one of the syllabus. "An offense is of an inferior degree if its elements are 'identical to or contained within the indicted offense, except for one or more additional mitigating elements.' " *Id.*, quoting *Deem* at paragraph two of the syllabus.

{¶ 11} "Voluntary manslaughter is an inferior degree of aggravated murder[.]" *State v. Florence*, 2d Dist. Montgomery No. 20439, 2005-Ohio-4508, ¶ 42, quoting *State v. Tyler*, 50 Ohio St.3d 24, 36, 553 N.E.2d 576 (1990). "The mitigating element * * * is that the defendant acted 'while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force.' " *Beatty-Jones* at ¶ 21, quoting R.C. 2903.03(A). "A trial court must charge the jury on an inferior offense if the evidence presented at trial reasonably supports, in addition to an acquittal on the indicted offense, a conviction on the inferior offense." *Id.* at ¶ 20, citing *Deem* at paragraph

one of the syllabus.

{¶ 12} The analysis of voluntary manslaughter's mitigating element first involves an objective question and second a subjective question. The objective question is whether the victim's provocation was " 'sufficient to arouse the passion of an ordinary person beyond the power of his or her control,' " *Id.* at ¶ 22, quoting *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992), "or described differently, whether the provocation was 'reasonably sufficient to bring on extreme stress and * * * to incite or arouse the defendant into using deadly force,' " *Id.*, quoting *Deem* at paragraph five of the syllabus. The subjective question is "whether this particular defendant was in fact acting under a sudden passion or in fit of rage." (Citation omitted.) *Id.* "When analyzing the subjective prong of the test, 'evidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage.' " *State v. Harding*, 2d Dist. Montgomery No. 24062, 2011-Ohio-2823, ¶ 43, quoting *State v. Stewart*, 10th Dist. Franklin No. 10AP-526, 201[1]-Ohio-466, ¶ 13.

{¶ 13} We apply abuse-of-discretion review to the trial court's denial of Coleman's request for a voluntary-manslaughter instruction. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 152. With the foregoing standards in mind, we see no abuse of discretion in the trial court's refusal to instruct the jury on voluntary manslaughter. We see virtually nothing in the record suggesting that Coleman shot Burdette while under the influence of sudden passion or in a fit of rage caused by serious provocation from Burdette that was reasonably sufficient to incite Coleman into using deadly force.

{¶ 14} The confrontations prior to the shooting involved (1) Russell arguing with

McGee about returning McGee's handgun that had been secured in Russell's truck and (2) Russell arguing with Burdette about Burdette breaking a beer bottle on Russell's truck. After Russell and Burdette calmed down, Russell began arguing with McGee again. At that point, Coleman punched Burdette and then shot him in the face. There is no evidence that Burdette was armed at the time of the incident. In fact, multiple witnesses testified that he did not possess a weapon or that they did not see him with one that night. Russell testified that Burdette did not pose a threat that evening and did not make any threats to Coleman. Russell further testified that he never heard Burdette say anything about having guns. Tyrone McGee likewise testified that he did not hear Burdette say anything to Coleman about having guns or threatening to call his "people."

{¶ 15} Bouncer Michael Fox testified that he was walking across the street toward the bar when he did hear "somebody holler something about "guns" or "I got guns." (Trial Tr. at 340.) Fox testified that he then turned and saw Coleman punch and shoot Burdette. (*Id.*) At trial, Fox was unable to identify who made the "guns" comment. Detective David House also testified about what Fox heard that night. House interviewed Fox after the shooting. According to House, Fox reported hearing Burdette say "I got guns" and "I'll call my people" before being shot. (*Id.* at 678, 684.) House testified that Fox reported hearing Burdette make these statements after being punched by Coleman and just before being shot. (*Id.* at 685.)

{¶ 16} In his own interview at the police station, Coleman responded as follows when detective House asked why he shot Burdette:

> [Burdette] say he'll pull up on me to my house and you know, he'll
> 
> shoot me and do this and do that the third [sic]. And I'm like, well, you don't

make no threats to me because you might not never make it. You know what I'm saying? Because you got to go get your shit.

\* \* \*

You know? And I get tired of people making them type of threats to me talking about what you gonna do to me. It's not gonna work because I'm gonna get you first.

*Id.* at 658.

{¶ 17} According to detective House, Coleman did not say anything about being in a rage or losing control at the time of the shooting. (*Id.*) Witnesses at the scene also reported that Coleman did not appear to be in a fit of passion or rage immediately before or after the shooting.

{¶ 18} Even if we assume, arguendo, that before being punched Burdette did say something to Coleman about having guns, calling his "people," and showing up at Coleman's house, these comments did not come close to justifying a voluntary-manslaughter instruction. Viewed objectively, any threat of harm to Coleman was not reasonably sufficient to incite him to respond with immediate deadly force. The record also does not suggest that Coleman subjectively was acting under a sudden passion or in fit of rage. No eyewitnesses testified about seeing Coleman in such a condition, and Coleman's own police statement did not suggest a fit of passion or rage. Based on the evidence before us, the trial court did not abuse its discretion in denying Coleman's request for a voluntary-manslaughter instruction. The first assignment of error is overruled.

{¶ 19} In his second assignment of error, Coleman contends the trial court erred

in entering a guilty verdict and sentencing him on the firearm specification accompanying count six, which charged him with discharging a firearm on or near a prohibited premises. Coleman argues that the record does not contain a jury verdict form addressing the mandatory three-year firearm specification accompanying this count. Therefore, he contends the trial court erred in entering a guilty verdict on the specification and sentencing him on it.

{¶ 20} Upon review, we find Coleman's argument to be unpersuasive. As an initial matter, the trial court did not impose a separate sentence on the firearm specification accompanying count six. The trial court found that the offense in count six (discharging a firearm on or near a prohibited premises) and the accompanying firearm specification merged into purposeful murder and the firearm specification associated with that count.[2] We note too that the record does contain a jury verdict form for the firearm specification accompanying count six. All of the original verdict forms signed by the jurors were filed and made part of the record below as "Court's Exhibit II" at docket number 200. We examined those verdict forms and found among them the signed verdict form for the firearm specification accompanying count six. Finally, we note that the jury's verdict on the firearm specification was read in open court. (Trial Tr. at 814.) Because the jury did return a verdict form for the firearm specification, and that form was made part of the record, we overrule Coleman's second assignment of error.

{¶ 21} In its assignment of error on cross-appeal, the State challenges the trial court's merger of Coleman's conviction for discharging a firearm on or near a prohibited

---

[2] In fact, the trial court's failure to impose a sentence for the firearm specification accompanying count six is the subject of the State's cross appeal.

premises with his purposeful-murder conviction. The State objected to the merger below. It argues on appeal that merger was not appropriate because the two offenses had a dissimilar import or significance.

{¶ 22} We review the trial court's merger ruling de novo. *State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, ¶ 10. " 'As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.

{¶ 23} In the present case, the trial court attempted to distinguish *State v. Williams*, 2d Dist. Montgomery No. 27663, 2018-Ohio-1647, in which we applied plain-error review and held that discharging a firearm on or near a prohibited premises and murder were not subject to merger because they were of dissimilar import or significance. We recognized in *Williams* that offenses may be of dissimilar import or significance when they involve different victims, when they are not alike in their resulting harm, or when a defendant's conduct places more than one person at risk. The defendant in that case fired multiple shots across a roadway in rapid succession, striking and killing the victim.

{¶ 24} Here the trial court found *Williams* distinguishable and determined that Coleman's convictions for discharging a firearm on or near a prohibited premises and

purposeful murder were subject to merger. In support, it reasoned:

> * * * The case is cited by the State and I think it's a pretty applicable case in the sense that it addresses this type of a charge. Discharge of a firearm on or near prohibited premises in a murder case. There the Second District Court of Appeals, and I think it was just a[s] recently as last year, 2018, found that discharge of a firearm on or near prohibited premises was not an allied offense, in similar report [sic] to murder.

> I think in case—it's been argued, the facts of that's been argued by the lawyers. The Court has examined it. I think that the Bryson Williams, that's the Bryson Williams case is distinguishable from the facts in this case. There you had someone shooting into a crowd might be an exaggeration. A number of people across a street, people gathered in front of a store there. And actually, I think the shot was intended for someone who did not strike, struck another person and killed that other person.

> In this case, the Court knows from the facts, of course presided at trial. We have the video. This case involved the Defendant in very close proximity to the victim firing the shot within—first the Defendant struck the victim. The victim was staggering in the street. Then the Defendant shot at close range the victim and probably no more than two or three feet away. It's not like it went clear across the roadway as in the *Williams* case.

> It also—I noted in Williams that the Court analyzed that issue under a plain error type doctrine. Which is, I think—here defense counsel has raised this. It was not raised at that time. And the Court specifically

mentioned that it was analyzing it under plain error doctrine. So given the facts in this case, the Court finds that Count IV, discharge of a firearm on or near a prohibited premises is a[n] allied offense to murder under the fact[s] of this particular case.

(Trial Tr. at 822-823.)

{¶ 25} Upon review, we conclude that the purposeful murder and the discharging-a-firearm offenses were not committed separately and were not committed with a separate animus. The record reflects that Coleman fired a single shot at close range with the singular motivation of killing Robert Burdette. In our view, however, the trial court's observations that the two men were in close proximity and that Coleman, who was standing in the street, did not shoot completely across the roadway fail to adequately address the first question above, namely whether the offenses were of dissimilar import or significance.

{¶ 26} In *Williams*, 2d Dist. Montgomery No. 27663, 2018-Ohio-1647, we noted that offenses may be of dissimilar import or significance when (1) they involve different victims, (2) they are not alike in their resulting harm, or (3) a defendant's conduct places more than one person at risk. Upon review, we found that the defendant's offenses were not subject to merger, reasoning:

> Williams was convicted and sentenced on one count of murder for causing Terion Dixon's death as a proximate result of committing felonious assault. He also was convicted and sentenced on one count of discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), which provides: "No person shall do any of the following: * * * Discharge a

firearm upon or over a public road or highway." Notably, "[t]he victim of the offense of discharging a firearm upon or over a public road or highway is the public. This is because it is the act itself that is prohibited. The offense can be completed with no one remotely near the location where the firearm is discharged upon or over the public road or highway. R.C. 2923.162(A)(3) is a statute intended to benefit the public good[.]" *State v. James*, 2015-Ohio-4987, 53 N.E.3d 770 (8th Dist.), ¶ 33; *see also State v. Carzelle*, 8th Dist. Cuyahoga No. 105425, 2018-Ohio-92 (applying *James*). Although Williams actually shot and killed Dixon, his act of firing a handgun across the roadway itself violated the statute, placed numerous people at risk, and harmed the public at large. [Footnote omitted.] Conversely, his murder conviction required harm to a particular victim and differed in the significance and the nature of the harm it addressed.

*Id.* at ¶ 24.

{¶ 27} As in the present case, we acknowledged in *Williams* that the defendant's act of shooting the victim "elevated the degree of the offense of discharging a firearm on or near prohibited premises to a first-degree felony." *Id.* at ¶ 24, fn. 4. We nevertheless found merger not required because "the act of discharging a firearm over a public road or highway itself constituted a violation of the statute." *Id.* This court has followed Williams on several occasions, finding that discharging a firearm on or near a prohibited premises does not merge with murder or other offenses because the offenses are of dissimilar import or significance. *State v. Shoecraft*, 2d Dist. Montgomery No. 27860, 2018-Ohio-3920, *In re T.P.-A.*, 2d Dist. Montgomery No. 28196, 2019-Ohio-2038, ¶ 17-18; *State v.*

*Ropp*, 2d Dist. Champaign No. 2018-CA-44, 2020-Ohio-824, ¶ 26; *see also State v. Johnson*, 10th Dist. Franklin No. 18AP-889, 2019-Ohio-4265, ¶ 19 ("Though we are mindful that [the defendant's] act of shooting [the victim] elevated the degree of the offense of discharging a firearm on or near a prohibited premises to a first-degree felony pursuant to R.C. 2923.162(C)(4), we nonetheless still find the offense of discharge of a firearm on or near prohibited premises, under these specific facts, to cause separate and distinct harm to the public."). We recognize that *Williams* and some of the other cases cited above involved plain-error review of a trial court's failure to merge the offense of discharging a firearm on or near a prohibited premises with another offense. Although the procedural posture of Coleman's case is different, insofar as the State objected below and now challenges the trial court's decision to apply merger, we find the substantive analysis in *Williams* and the other cases equally applicable here.

**{¶ 28}** We accept that Coleman committed a single act with a single animus when he shot Burdette in the face. Based on the case law set forth above, however, we conclude that his offenses of murder and discharging a firearm on or near a prohibited premises were of dissimilar import or significance. Even if we assume, arguendo, that Coleman's close-range shot did not place multiple people at risk, we recognized in *Williams* that offenses also may be of dissimilar import or significance when they involve different victims. Here the two offenses involved separate victims, as Coleman's act of firing on the roadway harmed the public at large and his act of murder harmed Burdette personally. We note too that Coleman's shot was not required to go entirely across a roadway. In *State v. Davison*, 2d Dist. Montgomery No. 28579, 2021-Ohio-728, we found that discharging a firearm on or near a prohibited premises and aggravated murder did

not merge even though the defendant fired at his victims from point-blank range while sitting in his vehicle on the road.

{¶ 29} For the foregoing reasons, we conclude that the trial court erred in merging discharging a firearm on or near a prohibited premises into Coleman's purposeful-murder conviction. In light of this determination, the State next argues that the trial court is obligated to impose an additional three-year sentence for the firearm specification accompanying the discharging-a-firearm conviction.

{¶ 30} Although under R.C. 2929.14(B)(1)(b) a trial court ordinarily may impose only one additional prison term for three-year firearm specifications attendant to felonies committed as part of the same act or transaction, the State contends an exception applies. In particular, the State claims R.C. 2929.14(B)(1)(g) obligates the trial court to impose two separate prison sentences for three-year firearm specifications accompanying Coleman's discharging-a-firearm and purposeful murder convictions.

{¶ 31} In response, Coleman does not challenge the correctness of the State's argument. He argues only that the State waived the issue below. Colman notes that the State opposed merger of the offenses of discharging-a-firearm and purposeful murder. At the same time, however, the State did not address R.C. 2929.14(B)(1)(g) or dispute whether the firearm specification accompanying the discharging-a-firearm offense was subject to merger. Under these circumstances, Coleman maintains that the State may not argue for separate sentences on the two firearm specifications now.

{¶ 32} Upon review, we conclude that the trial is required to impose a separate three-year sentence for the firearm specification accompanying the discharging-a-firearm offense. Under R.C. 2941.145, Coleman was found guilty of multiple three-year firearm

specifications for having a firearm on or about his person while committing his offenses and displaying, brandishing, indicating that he possessed, or using it to facilitate the offenses. Although a trial court ordinarily may impose only one additional three-year prison term for multiple firearm specifications committed as part of the same act or transaction (*see* R.C. 2929.14(B)(1)(b)), an exception is created by R.C. 2929.14(B)(1)(g), which provides:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 33} Here Coleman was convicted of two or more felonies, and one of those felonies was murder. He also was convicted of three-year firearm specifications of the type described under R.C. 2929.14(B)(1)(a) in connection with two or more of the felonies. Therefore, the trial court is required to impose the three-year prison term specified under R.C. 2929.14(B)(1)(a) "for each of the two most serious specifications" of which Coleman was convicted. In short, the trial court is obligated by statute to impose separate prison

terms for the three-year firearm specifications accompanying Coleman's purposeful murder and first-degree-felony discharging-a-firearm convictions.[3]

{¶ 34} We reject Coleman's argument that the State waived the foregoing issue by failing to raise it below. A sentence that violates a statutory mandate is by definition contrary to law. In the present case, the trial court committed plain error when it overlooked the statutory mandate in R.C. 2929.14(B)(1)(g) obligating it to impose a separate three-year prison sentence for the firearm specification accompanying Coleman's discharging-a-firearm conviction. Therefore, we may correct the error on appeal. The State's assignment of error is sustained.

{¶ 35} Based on the reasoning set forth above, we reverse the trial court's judgment insofar as it merged Coleman's conviction for discharging a firearm on or near a prohibited premises into his conviction for purposeful murder. The doctrine of merger did not apply because the two offenses were of dissimilar import or significance. We also reverse the trial court's judgment insofar as it merged the three-year firearm specifications accompanying Coleman's discharging-a-firearm and purposeful-murder convictions. The matter is remanded for a limited resentencing to correct these errors. In all other respects, the trial court's judgment is affirmed.

. . . . . . . . . . . . .


TUCKER, P. J. and EPLEY, J., concur.

---

[3] Parenthetically, we note that the firearm specifications accompanying the felony-murder and felonious-assault counts properly were merged into the firearm specification accompanying the purposeful-murder count because the felony-murder and felonious-assault counts themselves merged into the purposeful murder.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
J. David Turner
Hon. Timothy N. O'Connell